MAURICE SPREWER
5105 N. 47th Street
Milwaukee, WI 53218

                       Plaintiff,

v.                                                                         Case No. 2023-cv-1488

STATE OF WISCONSIN, DEPARTMENT OF
WORKFORCE DEVELOPMENT
201 E. Washington Avenue
Madison, WI 53703

                       Defendant.

## COMPLAINT

**NOW COMES** the Plaintiff, Maurice Sprewer, through his attorneys, OVB Law & Consulting, S.C., hereby alleges as follows:

### PARTIES

1. Plaintiff, Maurice Sprewer, is citizen and resident of the United States and Milwaukee County, Wisconsin.

2. Defendant, State of Wisconsin, Department of Workforce Development, is an employer who engages in an industry affecting commerce and employs more than 50 full-time employees.

### JURISDICTION AND VENUE

3. This action arises under the Americans with Disability Act of 1990, 42 U.S.C.A. § 12101 et seq., and under 42 U.S.C. § 1983.

4. Jurisdiction over this claim is invoked pursuant to 28 U.S.C.A. §§ 1343(a)(3) and (4), 29 U.S.C.A. § 626(c)(1).

1

5. Charges against Defendant alleging disability discrimination were timely filed with the Equal Employment Opportunity Commission ("EEOC") through a Charge of Discrimination.

6. In its investigation of Plaintiff's disability discrimination claims, the EEOC determined that there was reasonable cause to believe that Defendant discriminated against Plaintiff in violation of the Americans with Disability Act.

7. The EEOC subsequently issued Plaintiff a Notice of Right to Sue Letter on August 10, 2023.

8. Prior to bringing this suit, Plaintiff exhausted his administrative remedies for his claims against Defendant.

9. This action properly lies in the Milwaukee Division of the Eastern District of Wisconsin pursuant to 28 U.S.C.A. § 1391(b) because the claim arose in this judicial district and both parties reside/have their principal place of business within this judicial district.

## STATEMENT OF FACTS

10. Plaintiff was employed by Defendant from on or around November 17, 2014, to September 10, 2021.

11. Throughout his employment with Defendant, Plaintiff had various employment positions and job duties. However, the position that he was in during the times relevant to this matter and at the time of his termination was the position of Employment & Training Specialist.

12. As an Employment & Training Specialist, Plaintiff was compensated with an annual salary of $42,000 per year.

13. Throughout his employment with Defendant, Plaintiff satisfactorily performed the essential duties of his position.

14. During his employment with Defendant, Plaintiff was diagnosed with Post-Traumatic Stress Disorder, Anxiety, and Depression. The Post-Traumatic Stress Disorder diagnosis was a condition that Plaintiff had had since around 1990.

15. At the time of the diagnoses, Plaintiff promptly informed Defendant and provided Defendant with documentation of his diagnoses.

16. Due to the COVID-19 pandemic, in March 2020, Plaintiff was directed by Defendant to perform his work duties at home/remotely as a result of the statewide office closings and stay at home orders.

17. During this time, Plaintiff's job duties were performed remotely, and he was not required to perform in-person work.

18. In early Spring 2021, Plaintiff began undergoing a series of medical procedures for dental treatment and denture implants that involved surgical removal of 16 teeth.

19. Prior to undergoing these procedures, Plaintiff had discussions with Defendant's supervisory representatives to determine when it would be best to schedule the procedures.

20. Plaintiff's purpose of discussing with Defendant's supervisory representatives in considering when to schedule his procedures was to ensure that his job duties would still be remote given that the procedures and healing process would be difficult and limit his ability to work in-person.

21. In these discussions, Defendant's supervisory representatives told Plaintiff that he would not be required to return to the office for in-person work until September 2021.

22. Based on these statements and reassurances from his supervisors, Plaintiff proceeded with his surgical procedures in early Spring 2021.

23. The medical procedures required Plaintiff to wear temporary prosthetics for eating and talking during the several months while he healed from some of the surgeries and awaited his next surgery. The temporary prosthetics, however, were only to be worn for limited periods per day as they interfered with the healing process.

24. The surgeries and wearing the temporary prosthetics worsened Plaintiff's chronic severe Post-Traumatic Stress Disorder and triggered the symptoms of his Post-Traumatic Stress Disorder.

25. In particular, the temporary prosthetics in particular caused Plaintiff severe emotional distress, anger, irritability, and significantly limited his ability to focus and work. The longer Plaintiff wore the temporary dentures during a day, the worse his condition became.

26. Given the Post-Traumatic Stress Disorder symptoms Plaintiff was having and given the need for the temporary prosthetics to be worn for limited periods to allow for proper healing, Plaintiff's doctor restricted Plaintiff to wearing the temporary prosthetics to no more than 4 hours per day.

27. In addition to the mental health effects the surgeries had on Plaintiff, the surgeries and dentures also had a direct physical impact on Plaintiff. In particular, the surgeries and dentures caused Plaintiff pain, affected his ability to speak, eat, and ability to work.

28. With each surgery, Plaintiff needed time off work for the surgery itself and to heal from the surgery. He also required accommodations during the times in between surgeries.

29. On or around May 20, 2021, Defendant informed Plaintiff that he would be required to return to in-person work at the office full-time beginning on or around July 6, 2021.

30. In the May 20, 2021 return-to-work notice, Defendant indicated that "flexible schedules will be permitted" and that "telecommuting up to 3 days per week may be permitted."

31. The demand that Plaintiff return to office for full-time in-person work by July 6, 2021, violated his supervisor's original promise that full-time, in-person work wouldn't be required until September 2021.

32. Given that Plaintiff had relied on his supervisor's previous indication about not needing to return to in-person work until September 2021, when he was demanded to return full-time to

in-person work in July 2021, Plaintiff was unable to meet these standards to due his ongoing surgeries, temporary prosthetics, and mental health diagnoses.

33. Plaintiff, however, was able to continue to perform his work duties with a reasonable accommodation.

34. Defendant was notified of Plaintiff's work restrictions via Plaintiff personally notifying Defendant and Plaintiff's doctors notifying Defendant through doctors' notes.

35. At the time of notification, Plaintiff requested that he be provided a reasonable accommodation to accommodate his disabilities and work restrictions due to his disabilities.

36. Pursuant to his doctor's instructions to work from home without wearing the prosthetics, Plaintiff requested an accommodation to be allowed to continue working from home for a limited basis.

37. Plaintiff was not requesting full-time, permanent remote work. He was only requesting remote work until he could have his next surgery for the permanent implants, i.e., through October 2021.

38. In June 2021, Plaintiff's direct supervisor originally granted Plaintiff's request and allowed him to continue working remotely for a few weeks.

39. Despite Plaintiff's informal accommodation agreement with his direct supervisor, Plaintiff still submitted the proper paperwork to request the accommodation from Defendant. In his accommodation request, Plaintiff submitted doctors' notes to support his medical need for the accommodation.

40. Plaintiff's accommodation request was received by Defendant no later than July 8, 2021.

41. On or around July 13, 2021, Plaintiff updated his accommodation request to reflect that his doctor had cleared him for 50% office work (i.e., 4 hours max in office, with the other 4 hours worked from home each day), and to update that he was now only seeking to work from home

50% of the time through October 2021. In updating his request, Plaintiff submitted additional medical documentation reflecting the changes and reflecting the doctor's explanation for why Plaintiff needed 50% remote work as an accommodation.

42. Before Plaintiff had updated his accommodation request, Defendant internally indicated that they could not accommodate Plaintiff's request.

43. Even after Plaintiff updated his accommodation request, Defendant still indicated that they could not accommodate his request even at 50% remote work.

44. At the time Plaintiff submitted both his accommodation requests, Defendant had a Telecommuting Policy which permitted employees to work up to 60% remote work.

45. Plaintiff was eligible for and met the requirements necessary for the Telecommuting Policy to apply to him.

46. Yet, Defendant still denied his accommodation request, refused to let Plaintiff perform any remote work, and refused to otherwise accommodate Plaintiff.

47. Despite Defendant making internal denials of Plaintiff's accommodation request as early as July 13, 2021, Plaintiff was not informed of Defendant's decision to deny his request until almost a month later, August 9, 2021.

48. In denying Plaintiff's accommodation requests, both for full-time remote work and 50% remote work, Defendant did not offer any alternative accommodations or otherwise engage in an interactive process to determine if another accommodation was available for Plaintiff to meet his medical needs.

49. Instead, Defendant demanded that Plaintiff report for full-time, in-office work.

50. Given Defendant's refusal to accommodate and demand that Plaintiff return to in-office work, full-time, Plaintiff felt that he was being forced to choose between his health and his job.

51. As such, he had no choice but to take intermittent leave under the Family and Medical Leave Act ("FMLA") to allow him to come into the office for four hours each day and then take the rest of the day off in order to meet his medical needs and restrictions of not wearing the temporary prosthetics for more than 4 hours per day.

52. Although Plaintiff could have been working at home the rest of each day and could satisfactorily perform his job duties between the half in-person/half remote work, Defendant refused to permit Plaintiff to work from home in any capacity.

53. Instead, Plaintiff was prohibited from performing any work when he was at home each day and was instead required to use the FMLA leave to account for that time.

54. Plaintiff's leave under the FMLA was unpaid.

55. Plaintiff did not request leave as an accommodation, nor did Plaintiff want leave as an accommodation.

56. Plaintiff wanted an accommodation that would meet his medical needs and allow him to continue performing his work and otherwise enjoy the benefits of employment that his non-disabled co-workers were allowed to enjoy.

57. Plaintiff brought this failure to accommodate and treatment by his supervisor to the attention of Defendant via submitting complaints about the lack of accommodation internally and externally.

58. In addition to his internal opposition to Defendant's treatment of him, Plaintiff also filed a Charge of Discrimination with the EEOC on or around August 5, 2021. Plaintiff's Charge of Discrimination alleged that he had requested a reasonable accommodation for his disability from Defendant and that he believed Defendant was discriminating against him and failing to provide him with reasonable accommodation in violation of the Americans with Disabilities Act.

59. Upon information and belief, Defendant did not investigate Plaintiff's complaints or otherwise resolve Plaintiff's complaints.

60. Further, upon information and belief, Defendant did nothing to remedy the issue and failed to provide Plaintiff an accommodation for the matter.

61. Given Defendant's treatment towards him, Defendant's repeated denials of Plaintiff's accommodation requests, and Defendant's indifference towards Plaintiff's medical needs and disabilities, Plaintiff was at a loss of what to do and felt that he could no longer continue working with Defendant especially given the physical, mental, and financial toll Defendant had forced on Plaintiff in refusing and failing to accommodate him.

62. Not only was Plaintiff not adequately accommodated for his disabilities and work restrictions, but Plaintiff also faced other treatment which he felt discriminatory.

63. Eventually, because of Defendant's treatment, Plaintiff was pushed to a breaking point where he was mentally, physically, and financially unable to continue working for Defendant.

64. Despite all Plaintiff had suffered from with his disabilities and surgeries, all Plaintiff wanted was to work with Defendant in a non-discriminatory environment which provided him reasonable accommodations for his disabilities so as to provide him with the same employment opportunities as his non-disabled co-workers.

65. Defendant, however, was unable to provide such a work environment and instead provided a work environment that failed to accommodate Plaintiff and caused Plaintiff physical pain, mental anguish, and monetary losses. As such, Plaintiff had no other choice but to resign from employment.

66. On or around September 10, 2021, Plaintiff submitted a written resignation to Defendant.

67. As a direct result of Defendant's conduct and treatment, Plaintiff has suffered emotional distress, mental anguish, physical pain and discomfort, humiliation, and monetary losses.

# FIRST CAUSE OF ACTION

## Failure to Provide Reasonable Accommodation in Violation of the Americans with Disabilities Act.

Plaintiff incorporates and realleges paragraphs 1-67.

68. Plaintiff has several disabilities within the purposes of the Americans with Disability Act, including his mental health disabilities including Post-Traumatic Stress Disorder, Anxiety, and Depression.

69. Plaintiff is disabled due to his Post-Traumatic Stress Disorder, Anxiety, and Depression because these mental health conditions substantially limit several major life activities including, among other ways, by affecting his mood, cognitive function, memory, sleep, concentration, gastrointestinal function.

70. Beginning in early Spring 2021 through his termination, Plaintiff was additionally disabled due to the dental surgeries and implant procedures he was going through.

71. Not only did the surgeries and implants themselves substantially limit several major life activities including talking, eating, and swallowing, they also worsened Plaintiff's Post-Traumatic Stress Disorder making it significantly harder to perform several major life activities and impacting him so much that he could not tolerate more than 4 hours per day of wearing the temporary prosthetics.

72. Defendant, through its agents and officials, was aware of Plaintiff's disabilities due to his mental health diagnoses since on or around the time Plaintiff was diagnosed with them many years prior to his end of employment.

73. Defendant, through its agents and officials, was aware of Plaintiff's additional disabilities from the surgeries and implants since on or around June 2021.

74. Throughout the duration of Plaintiff's employment with Defendant, Plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation.

75. To the present date, Plaintiff is qualified to perform the essential functions of the job with Defendant, with or without reasonable accommodation.

76. Beginning in June 2021, Plaintiff required a reasonable accommodation to allow him to continue performing the essential functions of his job with Defendant.

77. Under the Americans with Disabilities Act of 1933, employers are required to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual." 42 U.S.C.A. §12112(b)(5).

78. A reasonable accommodation may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modifications equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, . . . and other similar accommodations." 42 U.S.C. § 12111(9)(B). Any of these reasonable accommodations could have aided Plaintiff in being able to perform the essential functions of his job, yet Defendant provided none of such reasonable accommodations.

79. The particular accommodation that Plaintiff requested and needed as of July 13, 2021 for 50% remote work was a reasonable accommodation that would not have caused an undue burden on Defendant.

80. Specifically, at the time Plaintiff requested and needed an accommodation, Plaintiff's job duties as an Employment & Training Specialist only required him to be in office 50% of the time anyways as 50% of his job duties did not involve direct personal interaction and was done on a compute anyways.

81. Further, at the time, Plaintiff's department was still not allowing in-person services and the only job duty of Plaintiff's that required in-person work was work in the resource room. At the time, employees were assigned to the resource room in 4 hour or less intervals.

82. The department Plaintiff worked in with Defendant still did not allow in-person services through October 2021, and for several years after.

83. To date, many of Defendant's employees still work remotely, both part-time and full-time.

84. In fact, by refusing to accommodation Plaintiff with the 50% remote work, Defendant actually caused an undue burden on itself since Plaintiff was not able to work 100% in office and had to use FMLA leave to take half-days of work off.

85. Essentially by not accommodating Plaintiff, Defendant effectively ensured that an additional 20 hours of work per week was not performed when Plaintiff easily could have been performing such work remotely.

86. Even after Plaintiff repeatedly requested an accommodation from Defendant due to his disabilities to allow him to resume working, Defendant still failed to provide him an accommodation.

87. Outside of the specific accommodations that Plaintiff requested, there were additional accommodations that were reasonable, and Defendant could have provided to Plaintiff.

88. Specifically, there were other positions available with Defendant that Plaintiff could have been transferred to that would have been fully remote.

89. However, Defendant did not offer Plaintiff these alternative positions.

90. In fact, Defendant did not offer Plaintiff any other options or accommodations to accommodate him, nor did Defendant engage in discussions with Plaintiff to determine if other accommodations were even available.

91. Instead, after Defendant denied Plaintiff's requests, it forced him onto FMLA leave and provided no further assistance or discussion.

92. Defendant clearly did not want to accommodate Plaintiff for his work restrictions and disabilities as Defendant failed to even have a discussion with Plaintiff or otherwise engage in an interactive process with Plaintiff to determine a reasonable accommodation for Plaintiff.

93. At all times in which Plaintiff was able to work, Plaintiff was satisfactorily performing the essential functions of his job with Defendant, and he would have been able to continue performing the essential functions of his job if Defendant had provided Plaintiff a reasonable accommodation.

94. Defendant's conduct and treatment of Plaintiff shows that Defendant at all times failed to provide Plaintiff with a reasonable accommodation.

95. Because Defendant repeatedly failed to provide reasonable accommodations for Plaintiff's disabilities, Defendant violated the Americans with Disabilities Act of 1990.

96. Upon information and belief, Defendant's treatment of Plaintiff and failure to provide reasonable accommodation for his disabilities was intentional and malicious.

97. Because of Defendant's repeated failure to provide reasonable accommodations for Plaintiff's disabilities, Plaintiff has suffered damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### Discrimination in Violation of the Americans with Disabilities Act

Plaintiff incorporates and realleges paragraphs 1-97.

98. Under the Americans with Disabilities Act of 1990, it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedure, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

99. Upon information and belief, at or around the same time Plaintiff requested his accommodation to work 50% remotely, there were other similarly situated employees who were allowed by Defendant to work remotely and otherwise accommodated for remote work.

100. Further upon information and belief, these other individuals were not only allowed to work remotely, but they were also allowed to work remotely on a full-time basis.

101. Upon information and belief, of the other individuals that Defendant permitted to work remotely around the same time that Plaintiff had requested and needed remote work, none of the other employees had the same or similar disabilities as Plaintiff. Specifically, it is believed that none of the other individuals had disabilities that were due to mental health diagnoses similar to Plaintiff's.

102. Given the difference in treatment in allowing some individuals to work remotely while simultaneously denying Plaintiff's accommodation requests and refusing to allow Plaintiff to work remotely, Defendant has discriminated against Plaintiff on the basis of his particular disabilities.

103. Upon information and belief, Defendant treated Plaintiff differently in his request for remote work because his disabilities were not perceived as "physical" or "serious" in nature; Defendant engaged in impermissible discrimination against Plaintiff solely because his disabilities involved mental health conditions.

104. Additionally, at the time Plaintiff needed an accommodation for his disabilities, Defendant had a policy in affect which would have accommodated Plaintiff, the Telecommunicating Policy.

105. In addition to his accommodation request, Plaintiff specifically asked that he be considered for remote work under Defendant's Telecommunicating Policy.

106. In response, Defendant denied Plaintiff's request and refused to apply its own policy to Plaintiff.

107. Defendant did not provide Plaintiff with any reason for why it would not apply the Telecommunicating Policy.

108. Upon information and belief, other, non-disabled employees around this same time were permitted to work remotely under the Telecommuting Policy for up to 60% remote work.

109. Defendant's difference in treatment among employees for the Telecommuting Policy amounts to a discriminatory application of its own policies, policies which on their face are to be applied in a non-discriminatory manner.

110. However, in allowing other, non-disabled employees to utilize the Telecommuting Policy but refusing to allow Plaintiff the same benefits of the policy, Defendant discriminated against Plaintiff on the basis of his disabilities.

111. Defendant's discriminatory actions and discriminatory application of its Telecommuting Policy constitutes violations of the Americans with Disabilities Act of 1990 by discriminating against Plaintiff in the terms, conditions, and privileges of employment that other employees who did not have the same or similar disabilities as Plaintiff were otherwise able to enjoy.

112. Upon information and belief, Defendant's discriminatory treatment of Plaintiff on the basis of his disabilities was intentional and malicious.

113. As a direct result of Defendant's unlawful discrimination, Plaintiff has suffered damages in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**

**Constructive Discharge in Violation of the Americans with Disabilities Act**

Plaintiff incorporates and realleges paragraphs 1-113.

14

114. Defendant's discrimination against Plaintiff on the basis of his disabilities denied him equal access to employment benefits.

115. Defendant's discrimination and refusal to accommodate Plaintiff placed Plaintiff in a position where he had to choose between either (i) breaking his work restrictions and working full-time in person to allow him to keep earning his full pay, but causing him significant physical and emotional pain and potentially harming his healing process; or (ii) following his work restrictions and in return, being unable to work full time and lose out on a minimum of 20 hours' worth of work and pay per week.

116. The work conditions and impossible choice that Defendant placed Plaintiff in by refusing to accommodate him, and the way Defendant treated Plaintiff differently than other employees who were allowed to work remotely effectively prevented Plaintiff from enjoying the equal benefits of employment that other similarly situated employees got to enjoy. So much so that Defendant gave Plaintiff no reasonable alternative, but to resign from employment with Defendant.

117. By the time Plaintiff resigned on September 10, 2021, the conditions at work had become so intolerable for Plaintiff that a reasonable person in Plaintiff's situation would similarly have felt compelled to resign.

118. Upon information and belief, Defendant intentionally or maliciously made Plaintiff's working conditions unbearable so as to compel Plaintiff to resign.

119. Defendant's discriminatory actions and statements have in effect caused the constructive termination of Plaintiff, without Defendant having to explicitly terminate Plaintiff.

120. Defendant's constructive termination of Plaintiff directly resulted from Defendant's discrimination against Plaintiff on the basis of Plaintiff's disabilities and Defendant's refusal to accommodate Plaintiff.

121. By discriminating against Plaintiff because of his disabilities, Defendant has violated the Americans with Disabilities Act of 1990.

122. As a direct result of Defendant's unlawful discrimination, Plaintiff has suffered damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**

**Deprivation of Constitutional Rights in Violation of 42 U.S.C. § 1983**

Plaintiff incorporates and realleges paragraphs 1-122.

123. Plaintiff was part of a protected class in that he had a disability.

124. Defendant's treatment and refusal to accommodate Plaintiff amounted to a discriminatory difference in treatment and termination of Plaintiff all because Plaintiff's disability prevented him from working in-person 40 hours per week and because his disabilities were, in part, based on mental health conditions.

125. Plaintiff's protected status as a disabled person was clearly a motivating factor in the Defendant's decision to discriminate against Plaintiff.

126. The Fourteenth Amendment of the United States Constitution secures the rights of persons to be free from being subjected to discrimination by persons acting under color of state law on the basis of a person's status in a protected class. U.S. Const. Amend. XIV, § 1.

127. Defendant is a local government body within the State of Wisconsin.

128. Defendant was acting under the color of state law when it discriminated against Plaintiff and when its actions amounted to a constructive termination of Plaintiff because Defendant was acting in its official capacity at the time it took the unlawful discriminatory actions against Plaintiff.

129. Defendant deprived Plaintiff of his rights and privileges secured by the Fourteenth Amendment of the United States Constitution by subjecting him to unlawful discrimination.

130. As such, under 42 U.S.C. § 1983, Defendant is liable for the damages Plaintiff suffered from the deprivation of his constitutional rights in an amount to be determined at trial.

**WHEREFORE,** Plaintiff demands judgment against Defendant as follows:

1. Declaration that Defendant's conduct violated Plaintiff's rights,
2. Restore Plaintiff to his rightful place as an employee of Defendant's in a position equivalent to his prior position, with accounting for pay increases to those in the same or similar position since his end of employment, or in lieu of reinstatement, order front salary and benefits for the period remaining until normal retirement,
3. Award Plaintiff back salary and fringe benefits, up to the date of reinstatement or front salary and benefits accrual and prejudgment interest,
4. Award Plaintiff liquidated damages in an amount double the back salary and fringe benefits award,
5. Award Plaintiff compensatory damages for loss of future earnings, loss of benefits, mental or emotional distress,
6. Award Plaintiff punitive damages,
7. Award Plaintiff costs and attorneys' fees, and
8. Grant such other relief as it may deem just and proper.

Plaintiff demands trial by a jury of twelve of his peers.

Dated this 7th day of November 2023.

**OVB Law & Consulting, S.C.**
*Attorneys for Plaintiff*

*s/Megan Mirka*
State Bar No. 1116377
826 N. Plankinton Ave, Ste. 600

Milwaukee, WI 53203
(414) 585-0588 (office)
(414) 255-3031 (fax)
megan@ovblaw.com